IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| IN RE: LUMBER LIQUIDATORS ) <br> CHINESE-MANUFACTURED FLOORING ) <br> PRODUCTS MARKETING, SALES ) <br> PRACTICES AND PRODUCTS LIABILITY ) <br> LITIGATION ) <br> _____ ) | MDL No. 1:15-md-2627 (AJT/TRJ) |

This Document Relates to ALL Cases

| | |
|---|---|
| IN RE: LUMBER LIQUIDATORS ) <br> CHINESE-MANUFACTURED FLOORING ) <br> DURABILITY MARKETING AND SALES ) <br> PRACTICE LITIGATION ) <br> _____ ) | MDL No. 1:16-md-2743 (AJT/TRJ) |

This Document Relates to ALL Cases

## ORDER

This matter is before the Court on Plaintiffs' Motion for Final Approval of Class Action Settlement ("the Motion") [Doc. 1617]. Upon consideration of the Motion, the Class Action Settlement Agreement in Formaldehyde MDL and Durability MDL ("the Settlement") (Doc. 1618-1), the memorandum in support of final approval and the filed objections thereto, and the presentations and representations of Lead Counsel at the hearing held on the Motion on October 3, 2018, and, it appearing for the reasons set forth herein that it is appropriate and warranted that the proposed classes be certified for the purposes of the Settlement and that the Settlement is a fair, reasonable, and adequate resolution of the class claims resolved therein, *see In re Jiffy Lube Sec. Litig.*, 927 F.2d 155 (4th Cir. 1991), the Settlement is APPROVED.

## I. Background

### A. Procedural History

The Settlement arises out of Defendant's sale of laminate flooring products to more than 760,000 customers from 2009 to 2015. In March 2015, Plaintiffs, all of whom purchased the flooring products at issue, began filing law suits across the United States in both federal and state courts alleging that Defendants falsely stated that the flooring complied with the California Air Resource Board's ("CARB") maximum acceptable limits of formaldehyde emissions. [Doc. 1618 at 9–10].

In June 2015, the United States Judicial Panel on Multidistrict Litigation consolidated the pending federal cases and transferred them to this Court, where it proceeded in this Court as Case No. 1:15-md-2627 and has been referred to by the parties as the "Formaldehyde Litigation." [Doc. 1]. After this Court denied Defendant's motion to dismiss in part and granted it in part, the case proceeded to discovery, which involved the production of voluminous documentation and depositions of twenty-six fact and ten expert witnesses. *See* [Doc. 1618-3 at 4]. The parties completed fact discovery in early 2016. *See* [Doc. 878]. In August 2016, Defendant moved for summary judgment in the Formaldehyde Litigation. [Doc. 999]. The Court granted summary judgment in part and denied it in part. *See* [Docs. 1090, 1091].

In May 2015, purchasers of the same laminate flooring as in the Formaldehyde Litigation filed a proposed class action in the United States District Court for the Central District of California, alleging that Defendant also falsely claimed that the flooring at issue in the Formaldehyde Case met various international and industry durability standards. [Doc. 1618 at 12–13]. The California District Court ordered all plaintiffs who were not California residents to refile individual cases in their home federal districts. [Doc. 1618 at 13]. In response, those

2

plaintiffs filed individual actions in thirty-one federal districts throughout the United States. [Doc. 1618 at 13]. In October 2016, the Judicial Panel on Multidistrict Litigation consolidated those cases and transferred them to this Court, where it has proceeded as Case No. 1:16-md-2743 and has been referred to by the parties as the "Durability Litigation." [Doc. 3]. Thereafter, discovery commenced in the Durability Litigation. Plaintiffs conducted thirteen fact depositions and reviewed voluminous documents produced before the Court stayed discovery for purposes of mediation on August 17, 2017. [Doc. 1618 at 14].

After mediations in December 2015 and July 2016 and protracted settlement discussions throughout the latter part of 2016 and most of 2017, the parties in both MDLs on October 23, 2017 agreed to key settlement terms and entered into a Memorandum of Understanding to settle both cases in their entirety. *See* [Doc. 1618 at 14–16]. After additional negotiations to finalize the terms of settlement, the parties submitted the Settlement to this Court for preliminary approval on March 15, 2018. [Doc. 1339]. On June 15, 2018, the Court conditionally certified the two classes proposed in the Settlement, gave the Settlement preliminary approval and approved the parties' plan to notify the class of the Settlement's terms. [Doc. 1524]. Pursuant to the notice plan, the Court-appointed Claims Administrator began sending out over one million emails and postcards, together with online banner ads to notify class members of the Settlement. *See* [Doc. 1618-2 at 3–5]. The Claims Administrator also established a toll-free hotline and website for potential class members. [Doc. 1618-2 at 5–6]. Overall, approximately seventy-three percent of the class received notice through these efforts. [Doc. 1618 at 18–19].

Thus far, of the approximately 760,000 class members, 178,859 have filed claims pursuant to the Settlement. [Doc. 1688 at 12]. Ninety-four class members have opted out of the Settlement, and twelve class members filed objections to it. [Doc. 1688 at 7].

3

## B. The Settlement

In exchange for a release of all claims by class members in both the Formaldehyde and Durability Litigations, Defendant will create a non-reversionary fund consisting of $22 million in cash and $14 million in store-credit vouchers, for a total settlement amount of $36 million. [Doc. 1618-1 at 16].

Because the formaldehyde emissions levels allegedly varied during different time periods, the Settlement places class members into two classes. The first class (the "CARB1 Class") consists of customers who purchased a certain type of laminate flooring from Defendant between January 1, 2011 and May 31, 2015, and the second class (the "CARB2/Durability Class"), a much larger group, consists of customers who purchased the same type of flooring between January 1, 2009 and December 31, 2010. *See* [Doc. 1618-1 at 18–21].

The formaldehyde emissions levels during the time that the CARB2/Durability Class purchased the flooring were allegedly much higher than during the time in which the CARB1 Class customers purchased it, thus making the CARB2/Durability Class's claims stronger. [Doc. 1618 at 16 & n.7]. The benefits to be received by the two classes reflects this difference, as well as the overall priority to provide a realistic opportunity for class members exposed to the higher level of formaldehyde emissions to replace their flooring.

Class members in the CARB1 Class, the class of purchasers who were allegedly exposed to lower formaldehyde emissions than the members of the CARB2/Durability Class, may make a claim for an expected $50 cash award. *See* [Doc. 1618 at 17]. However, only $1 million of the settlement fund will be set aside for the CARB1 Class; thus, the award will be reduced proportionally if the claim participation rate exceeds estimates. [Doc. 1618 at 17–18].

Members of the CARB2/Durability Class have the option to choose between a cash payment or vouchers. [Doc. 1618 at 17]. The current deadline to make the selection is October 13, 2018. [Doc. 1618-2 at 7]. The vouchers are redeemable for up to three years after the settlement date, or longer if state law requires it, and are transferrable to a designated family member or charity elected by the eligible member. [Doc. 1618 at 17]. Voucher awards are based upon the class members' claim amount, while the cash payments are awarded *pro rata*. [Doc. 1618 at 17]. Vouchers are not available to class members in the CARB1 Class. [Doc. 1618 at 17].

Initial estimates predicted that class members who receive vouchers would receive value in the amount of between 50 and 134 percent of their original purchase price, while class members who receive cash would receive between 28 and 72 percent. [Doc. 1618 at 24]. The notice plan informed class members that they would likely receive between 20 and 56 percent of their purchase price if they chose the cash award and between 38 and 104 percent if they chose the vouchers. [Doc. 1688-2 at 2]. However, due to an actual participation rate double that of the initial estimates, current calculations indicate that those who elect the cash award will receive approximately 5.5 percent of their purchase price, and those who elect vouchers will receive approximately 59 percent. [Doc. 1688 at 3].

## II. Standard of Review

Federal Rule of Civil Procedure 23(e) requires the court to approve any settlement of a certified class. Where, as here, the settlement would bind class members in future litigation, the court may approve the settlement only if it finds that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "The primary concern addressed by Rule 23(e) is the protection of class members whose rights may not have been given adequate consideration

5

during the settlement negotiations." *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158 (4th Cir. 1991). The decision to approve or reject a proposed settlement is within the sound discretion of the district court. *See Flinn v. FMC Corp.*, 528 F.2d 1169, 1172 (4th Cir. 1975) (stating that the appeals court will only overturn a district court's approval of a settlement "upon a clear showing that the district court abused its discretion") (internal quotation marks omitted).

To find that a proposed settlement satisfies Rule 23(e)'s fairness requirement, the court must conclude that the settlement "was reached as a result of good-faith bargaining at arm's length." *In re Montgomery Cty. Real Estate Antitrust Litig.*, 83 F.R.D. 305, 315 (D. Md. 1979). This requires assessing four factors: "(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of . . . class action litigation." *In re Jiffy Lube*, 927 F.2d at 158–59.

To assess whether the settlement satisfies Rule 23(e)'s adequacy requirement, the court must consider five additional factors: "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." *Id.* at 159.

Because the classes in these matters have not been certified, the Court must also analyze whether they satisfy Federal Rule of Civil Procedure's requirements for class certification in order to certify the classes for the purpose of settlement. When certifying a class solely for the purpose of settlement, the Court must still ensure that the class meets all of Rule 23's requirements, with the exception of Rule 23(b)(3)'s manageability requirement, if applicable.

6

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). This includes both Rule 23(a)'s requirements and the requirement that certification is warranted under one of the bases enumerated in Rule 23(b).

To qualify for certification under Rule 23(a), the following requirements must be met: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Further, where, as here, the class is proposed under Rule 23(b)(3), Plaintiffs must show that common issues of law or fact predominate over any individual questions and that the class action is the superior method for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). The Court must find this by preponderance of the evidence. *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 104 (E.D. Va. 2009).

### III. Analysis

The Court has reviewed the Settlement and finds that it satisfies the standards required for approval under Rule 23(e). The Court further finds that the two proposed settlement classes satisfy Rule 23's requirements for class certification.

A. **Fairness Factors under Rule 23(e)**

*1. Posture of the Case at Settlement*

When a case settles at a very early stage of litigation, "questions of possible collusion," and thus the fundamental fairness of the settlement, arise. *Id.* By contrast, "in cases in which discovery has been substantial and several briefs have been filed and argued, courts should be inclined to favor the legitimacy of a settlement." *In re The Mills Corp. Sec. Litig.*, 265 F.R.D.

246, 254 (E.D. Va. 2009). In the Formaldehyde Litigation, the parties litigated a motion to dismiss and a motion for summary judgment. In the Durability Litigation, they litigated a motion to dismiss. In both MDLs, the parties engaged in extensive discovery and conducted dozens of depositions. Indeed, fact discovery was completed in the Formaldehyde Litigation prior to settlement. *See* [Doc. 878]. Therefore, the parties had ample time to develop the case and consider its merits and the potential costs and benefits of taking the case further. Against this backdrop, the Court finds nothing that suggests collusion or unfairness.

## 2. *Extent of Discovery*

As discussed, the parties conducted extensive discovery in both cases; and the Court further finds and concludes that "Plaintiffs have conducted sufficient informal discovery and investigation to fairly evaluate the merits of Defendants' positions during settlement negotiations." *Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995).

## 3. *Circumstances Surrounding the Negotiations*

The Court must also consider the circumstances leading up to the settlement agreement to ensure that counsel, acting with the class's interests as its guiding principle, "entered into settlement negotiations on behalf of their clients after becoming fully informed of all pertinent factual and legal issues in the case." *In re The Mills*, 265 F.R.D. at 255. "Absent evidence to the contrary, the Court should presume that settlement negotiations were conducted in good faith and that the resulting agreement was reached without collusion." *Deem v. Ames True Temper, Inc.*, 2013 WL 2285972, at *2 (S.D. W. Va. May 23, 2013) (citing *Newberg on Class Actions* § 11.28 (3d ed.1992)).

The Settlement is a product of extensive mediation and negotiation between the parties conducted over more than two years. The parties entered into their October 2017 Memorandum

of Understanding after multiple private mediations and two Court-ordered and supervised mediation sessions, and then engaged in additional, lengthy negotiations to finalize the Settlement's terms. *See* [Doc. 1618 at 14–16]. "These adversarial encounters dispel any apprehension of collusion between the parties." *In re NeuStar, Inc. Sec. Litig.*, 2015 WL 5674798, at *10 (E.D. Va. Sept. 23, 2015). Accordingly, the Court finds that the circumstances surrounding the Settlement counsel its approval.

### 4. *Experience of Counsel*

Lead Plaintiffs' counsel in both MDLs are well-qualified with extensive experience with complex civil litigation in federal courts, including the settlement of large class actions. *See, e.g.*, [Docs. 1339-2, 1339-3, 1618-3 at 7, 1625-1, 1625-2, 1626 at 2]. Defendant is represented by counsel from two large and well-respected firms, who are also well qualified. [Doc. 1618 at 23–24].

### B. Adequacy Factors under Rule 23(e)

### 1. *Strength of Plaintiffs' Case on the Merits and Defendant's Defenses at Trial*

The first two adequacy factors require the Court to consider "how much the class sacrifices in settling a potentially strong case in light of how much the class gains in avoiding the uncertainty of a potentially difficult case." *In re The Mills Corp.*, 265 F.R.D. at 256. Regarding the Formaldehyde Litigation, Plaintiffs have thus far survived both a motion to dismiss and a motion for summary judgment. As the Court observed in its order partially denying Defendant's motion for summary judgment, Plaintiffs planned to present at trial extensive testing and other evidence to demonstrate that Defendants informed class members that their flooring products met CARB formaldehyde standards and that they failed to meet at least some portion of those

standards,[1] proof of which is crucial to establishing the material reliance and falsehood elements of their misrepresentation claims and various elements of their warranty claims and claims under state consumer-protection statutes. It thus appears to the Court that Plaintiffs would likely have been able to establish a strong evidentiary basis for the elements of their claims at trial. However, Plaintiffs would still have to survive a class certification challenge and overcome the difficulty of proving damages accurately among a large nationwide class of customers.

While it appears to the Court that greater uncertainty as to the strength of Plaintiffs' case exists with respect to the Durability Litigation, Plaintiffs have survived a motion to dismiss, but with the need to complete discovery to build a sufficient evidentiary record to prove their warranty claims and survive summary judgment before proceeding to trial. A crucial element of proof necessary to survive summary judgment would be demonstrating class members' reliance on Defendant's representation that its flooring products satisfied industry durability standards, which could prove difficult given the class size. Moreover, Plaintiffs would still need to survive class certification, and, if the case were to proceed to trial, would need to present a damages model sufficient to establish the class members' cognizable damages resulting from warped or scratched floors.

In sum, while the Court finds that Plaintiffs would likely be able to proceed through a trial on the merits in both matters, both cases nevertheless present many challenges that make the classes' likelihood or amount of ultimate recovery uncertain. And while it is true that the Settlement will award class members only a fraction of their original purchase price, class members did receive years of use before the flooring's defects were allegedly discovered, and the Settlement will put an end to extensive litigation that could further erode Defendant's ability

---

[1] *See* [1:15-md-2627 Doc. 1126 at 5, 15, 17].

to pay an eventual judgment or later settlement. In light of these uncertainties and all the relevant circumstances, the Court finds that the $36 million Settlement is adequate.

### 2. Duration and Expense of Additional Litigation

If the two cases were to proceed to trial, counsel in the Formaldehyde Litigation would need to conduct certain expert discovery and qualify their own experts, including conducting *Daubert* hearings, and seek class certification pursuant to Rule 23 before presenting lengthy, complex cases at trial. In the Durability Litigation, the parties would need to complete those tasks and additionally complete fact discovery and litigate summary judgment motions. Future appeals are possible, if not likely. Plaintiffs' counsel estimate that "the concomitant expenses" of these activities "will be likely to run in the tens of millions." [Doc. 1618 at 27]. In any event, further litigation of the cases will be lengthy, complex, and expensive. Thus, this factor counsels in favor of approving the Settlement. *See In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 667 (E.D. Va. 2001) ("[A]dditional litigation of plaintiffs' claims . . . would likely have been protracted and costly, requiring extensive expert testimony . . . . Nor is it likely that this litigation would have ended with a jury verdict; there is little doubt that a jury verdict for either side would only have ushered in a new round of litigation in the Fourth Circuit and beyond, thus extending the duration of the case and significantly delaying any relief for plaintiffs.").

### 3. Solvency of Defendant and Expected Recovery of Judgment

Defendant's financial situation presented a significant challenge during settlement negotiations. Defendant's stock has seen a precipitous decline over the past five years, due in large part to the events giving rise to this litigation. Specifically, Defendant's stock decreased from a high of $114.19 per share in October 2013 to an August 2018 price of $17.31 per share. [Doc. 1618 at 28]. Defendant has also paid millions of dollars in regulatory fines and destroyed

millions of dollars in nonconforming inventory. *See* [Doc. 1618 at 28–29 (observing that Defendant paid $2.5 million in fines to California's Air Regulation Board and "agreed to destroy 22 million board feet of flooring it had pulled from its shelves in May of 2015")]. In addition, Plaintiffs' counsel estimate that Defendant sold over $824 million worth of flooring products at issue in these matters. [Doc. 1618 at 28]. Given this volume and Defendant's current financial condition, Plaintiffs' counsel contends that Lumber Liquidators could never afford to satisfy a judgment that awarded anything close to a full refund for purchasers. [Doc. 1618 at 28]. The Court agrees.

Reflecting this economic reality, vouchers comprise a significant portion of the settlement fund. This aspect of the settlement was designed to further the goal of feasibly allowing class members to replace the defective flooring they purchased through use of Defendant's product inventory rather its limited cash reserves. Given the likely inability of Defendant to pay what could amount to a far larger judgment, this factor favors approval of the Settlement. *See In re MicroStrategy*, 148 F. Supp. at 667 (noting that "the old adage, 'a bird in hand is worth two in the bush' applies with particular force" in a case in which a large judgment would likely amount to "a massive, unsecured claim against the company that might well lead to little or no recovery").

### 4. *Degree of Opposition to the Settlement*

"The attitude of the members of the class, as expressed directly or by failure to object, after notice, to the settlement, is a proper consideration for the trial court, though a settlement is not unfair or unreasonable simply because a large number of class members oppose it." *Flinn*, 528 F.2d at 1173 (quotation and footnote omitted). Indeed, "[t]he opinion of class members concerning the settlement 'is perhaps the most significant factor to be weighed in considering its

adequacy.'" *Winingear v. City of Norfolk*, 2014 WL 3500996, at *3 (E.D. Va. July 14, 2014) (quoting *In re MicroStrategy*, 148 F.Supp. 2d at 668). A small number of objections and a low opt-out rate suggest that the proposed settlement is adequate. *See In re The Mills Corp.*, 265 F.R.D. at 258 (observing that limited or no objections and "the paucity of opt-outs from the Class" "gives the Court a great deal of confidence in the settlement[']s adequacy").

In an attempt to reach more than 760,000 potential class members, Plaintiffs sent over one million combined emails and postcards. *See* [Doc. 1618-2 at 3–5]. Approximately 178,000 have filed claims. [Doc. 1688 at 12]. Thus far, ninety-four have opted out, representing an opt-out rate of approximately .05 percent of responders and .0127 percent of the potential class. [Doc. 1688 at 14]. Only twelve responders filed objections to the Settlement. [Doc. 1688 at 14]. These low opt-out and objection rates indicate widespread approval among the class and are consistent with or better than the objection rates in other large class action cases in this Circuit and elsewhere in which district courts have approved settlements in part because of low disapproval ratings within the class.[2] Accordingly, the Court finds that the small degree of opposition to the Settlement counsels in favor of its approval.

### C. **Objections**

Twelve objections to the Settlement have been filed. [Doc. 1688 at 10]. One objector has opted out of the Settlement, thereby rendering her objection moot. [Doc. 1688 at 10]. Of the eleven that remain, eight object primarily to the Settlement's adequacy, one objects to the selection procedures, and two object to Plaintiffs' motion for attorneys' fees.[3] [Doc. 1688 at 10–

---

[2] *See Churchill Village v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (forty-five of 900,000 class members objected and 500 opted out); *In re Wachovia Corp. ERISA Litig.*, 2011 WL 7787962, at *4 (W.D.N.C. Oct. 24, 2011) (four of 150,000 class members objected); *Domonoske v. Bank of Am., N.A.*, 790 F. Supp. 2d 466, 474 (W.D. Va. 2011) (fifty-nine of 3,025,689 class members objected and 0.04% opted out); *Lee v. Ocwen Loan Servicing, LLC*, 2015 WL 5449813, at *5 (S.D. Fla. Sept. 14, 2015) (four of 400,000 objected and 161 opted out); *Hall v. Bank of Am., N.A.*, 2014 WL 7184039, at *5 (S.D. Fla. Dec. 17, 2014) (nine of 1,000,000 objected).

[3] The Court will address these objections separately in its order addressing Plaintiffs' motion for attorneys' fees.

11]. In light of the above analysis of the Settlement's overall fairness, reasonableness, and adequacy, the Court overrules these objections.

## D. Class Certification

### 1. Rule 23(a)

#### i. Numerosity

Class certification is appropriate where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no set minimum number or "mechanical test for numerosity." *Holsey v. Armour & Co.*, 743 F.2d 199, 217. However, the sheer number of class members can make joinder impracticable. *E.g., Brown v. Transurban USA, Inc.*, 318 F.R.D. 560, 567 (E.D. Va. 2016) ("The numerosity requirement is easily met by the proposed Class here. The Parties agree that there are thousands of Settlement Class Members. Joinder of thousands of individuals would be exceedingly impracticable . . . .") (citing *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 425 (4th Cir. 2003)). So far, 178,859 class members have filed claims pursuant to the Settlement, out of a potential class of more than 760,000. [Doc. 1688 at 12]. Joinder of such a large number of class members is clearly impracticable; thus, the proposed classes satisfy the numerosity requirement.

#### ii. Commonality

To warrant certification, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). *See Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 350 (2011) ("What matters to class certification is the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."). Both MDLs resolved in the Settlement involve certain discrete factual questions about Defendant's conduct and its flooring products whose resolution is centrally implicated in every class member's case in both the

CARB2/Durability and CARB1 Classes. As to the Formaldehyde Litigation, these questions include Defendant's monitoring (or lack thereof) of their flooring suppliers' manufacturing operations, as required by CARB standards; whether Defendant's flooring products met CARB formaldehyde standards; whether Defendant claimed the flooring met those standards; whether Defendant knew the flooring did not meet CARB standards; and whether Defendant concealed information about its flooring products' failure to meet CARB standards. As to the Durability Litigation, these common questions include whether Defendant's flooring met industry and international durability standards and, if it did not, whether Defendant had knowledge of that failure to meet those standards and concealed it. The Court therefore finds that the proposed classes satisfy the commonality requirement.

### iii. Typicality

To satisfy Rule 23(a), "the claims or defenses of the representative parties" must also be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The representative plaintiffs' claims are not required to be "identical . . . in all respects" to those of all class members. *In re the Mills Corp.*, 257 F.R.D. at 105. Rather, the class members must "make[] similar legal arguments to prove the defendant's liability" and have claims that "arise[] from the same course of events." *In re Computer Scis. Corp. Sec. Litig.*, 288 F.R.D. 112, 117-118 (E.D. Va. 2012).

Here, the claims of the representative Plaintiffs and all potential class members all arise from their purchase of Defendant's flooring products in the operative time periods, and their theory of recovery centers on whether those products met CARB formaldehyde standards, whether they met certain durability standards, and Defendant's conduct and representations

concerning those products' characteristics. Thus, the representative Plaintiffs' claims are typical of the proposed classes that they represent.

### iv. Adequate Representation

Rule 23(a)(4) requires that all class members' rights be adequately represented in the event of certification. "[T]he adequacy requirement is met when: (1) the named plaintiff does not have interests antagonistic to those of the class; and (2) plaintiff's attorneys are qualified, experienced, and generally able to conduct the litigation. *Brown*, 318 F.R.D. at 567–68 (quotation omitted). As to the first requirement, the Court cannot identify any interests that might be antagonistic. Like all class members, the representative Plaintiffs bought flooring from Defendant during the operative time period, and their claims turn on the same questions as the claims of all class members. *See supra* Part III.D.1.iii. As to the second requirement, lead counsel in these matters possess extensive experience and have advocated vigorously on behalf of the class. *See supra* Part III.A.4. Accordingly, the Court finds that the proposed classes are adequately represented.

### 2. Rule 23(b)(3)

Further, the class must also qualify as one of the three Rule 23(b) class types. Plaintiffs have proposed that the classes proceed as classes certified under Rule 23(b)(3); and the Court has analyzed the proposed classes solely according to the requirements of that provision.

### i. Predominance

Rule 23(b)(3)'s first requirement is predominance. The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchen Prods.*, 521 U.S. at 623. Thus, Plaintiffs must show by preponderance of the evidence that a shared set of common questions is "dispositive and over-shadow[s] other issues." *Brown*,

318 F.R.D. at 568. As discussed above, all class members' claims turn on a handful of questions about whether Defendant's flooring products satisfied a shared set of formaldehyde and durability standards and on Defendant's representations about those flooring products. These dispositive questions predominate over all class members' claims. Accordingly, the Court finds that the proposed classes satisfy the predominance requirement.

### ii. Superiority

Finally, resolution of the proposed classes' claims through the vehicle of a class action must be a superior method for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). To analyze whether this requirement is met, Rule 23(b)(3) instructs the Court to consider (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. The fourth of these considerations—manageability—does not need to be considered when certifying a class for the sole purpose of settlement. *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 440 (4th Cir. 2003).

In these MDLs, requiring thousands of class members to try their own cases in various courts throughout the country would lead to duplicative, costly efforts, particularly in the area of discovery and attorneys' fees. Coupled with the prospect of recovering relatively small damages on an individual basis, there is a strong disincentive for individual class members to seek recovery from Defendant on their own. In light of these realities, the Court agrees with Plaintiffs' counsel that "this case is a quintessential one for aggregate treatment." [Doc. 1340 at

17

31]. The Court therefore finds that the proposed settlement classes satisfy Rule 23's requirements for class certification.

## IV. Conclusion

For the above reasons, the Court will approve the Settlement. In addition, Plaintiffs argue that the Court should order any objector who appeals the Court's order approving the Settlement to post an appeal bond pursuant to Federal Rule of Appellate Procedure 7.[4] [Doc. 1688 at 25–27]. Finding that efficient resolution of these matters and the provision of relief to the class after more than three years of litigation and negotiation is of primary concern, the Court will order any objecting class member who appeals this Order to file simultaneously with their notice of appeal a motion stating their position as to what bond amount, if any, should be set.

In addition, the high class-participation rate and the high percentage of class members who have selected the *pro rata* cash award thus far will result in a cash award to class members in the CARB2/Durability Class significantly lower than the low end of the estimates communicated to the class during the notice period. [Doc. 1688 at 13]. Currently, it is estimated that CARB2/Durability Class members who select the cash award will receive on average compensation in the amount of 5.5 percent of their purchase price, well below the estimated low of twenty percent communicated to them previously. [Docs. 1688 at 13, 1688-2 at 2]. Accordingly, the Court ordered at the hearing held on October 3, 2018 that new estimates be posted on the class action website and that the selection-period deadline be extended one week from October 13, 2018 to October 20, 2018.

---

[4] *See* Fed. R. App. P. 7 ("In a civil case, the district court may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal."); *In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*, 2012 WL 3984542, at *2 (D. Minn. Sept. 11, 2012) ("Appeal bonds are often required on appeals of class action settlements or attorneys' fee awards because the appeal effectively stays the entry of final judgment, the claims process, and payment to all class members.").

The Court also finds it warranted to retain its jurisdiction over the consolidated MDLs and the class members for the purposes of enforcing the Settlement as well as the efficient and fair resolution of those pre-trial proceedings that remain to be completed, particularly with respect to those class members in pending cases who have opted out of the settlement classes.

Accordingly, it is hereby

ORDERED that Plaintiffs' Motion for Final Approval of Class Action Settlement [Doc. 1617] be, and the same hereby is, GRANTED, and the Class Action Settlement Agreement in Formaldehyde MDL and Durability MDL ("the Settlement") (Doc. 1618-1) be, and the same hereby is, APPROVED; and it is further

ORDERED that the CARB1 Class for purchases of Chinese-manufactured laminate flooring from the Defendant from January 1, 2009 to December 31, 2010, and the CARB2/Durability Class for purchases of Chinese-manufactured laminate flooring from the Defendant from January 1, 2011 through May 31, 2015, be, and the same hereby are, CERTIFIED as Settlement Classes pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3); and it is further

ORDERED that the Settlement Administrator post on the class action website updated information on current cash and voucher selection rates, and those rates' estimated effect on the *pro rata* cash award, and that the selection deadline for class members in the CARB2/Durability Class to choose vouchers or the cash award pursuant to the Settlement be, and the same hereby is, EXTENDED to October 20, 2018; and it is further

ORDERED that the objections filed with respect to the Settlement, be, and the same, hereby are, OVERRULED; and it is further

ORDERED that any objecting class member who appeals this Order shall file together with the required notice of appeal, a motion stating their position as to what appeal bond amount, if any, should be set pursuant to Federal Rule of Appellate Procedure 7; and it is further

ORDERED that the Court retains its jurisdiction for purposes of enforcing the Settlement Agreement, the award of attorneys' fees, and this Order, and also its jurisdiction over those class members who have opted out of the settlement classes certified herein, including, but not limited to, those class members in pending cases that have been transferred to this Court by the Judicial Panel on Multidistrict Litigation as part of either the Formaldehyde Litigation or the Durability Litigation.

The Clerk is directed to forward copies of this Order to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
October 9, 2018